508 P.2d 757

**Otto E. MYRLAND, Appellant,**

v.

**Bertha G. MYRLAND, Appellee.**

**No. 2 CA–CIV 1300.**

Court of Appeals of Arizona,
Division 2.

April 17, 1973.

Rehearing Denied May 22, 1973.

Review Denied June 26, 1973.

D'Antonio & Videen, by Lawrence P. D'Antonio, Tucson, for appellant.

Charles D. McCarty, Tucson, for appellee.

HOWARD, Judge.

This appeal arises out of an action for divorce filed by Bertha Myrland, appellee, wherein she alleged that the parties had no community property and sought an order determining that all real and personal property in dispute which was in her name only, was her sole and separate property.

In his answer and two-count counter-claim the defendant-appellant alleged that the parties had substantial community property and common income in excess of $1,250 per month which was under the control of the plaintiff; that the parties had entered into a partnership in 1942; and that the assets acquired by the plaintiff were assets of the partnership acquired prior to the parties' marriage in 1952 and were community assets acquired by them after marriage in continuation of the partnership.

Otto Myrland appeals from that portion of the judgment decreeing certain property to be the sole and separate property of the appellee and awarding him the net amount of $937.43 together with interest as his share of the community property.[1] He also attacks the trial court's findings and conclusions that he failed to sustain his burden of proving a partnership agreement and that no such agreement of partnership was entered into.

The action was tried to the court, sitting without a jury, and required four days of trial due to the complex fact situation involved. The salient facts, viewed in a light favorable to the judgment, are as follows: In 1941, appellee, then Bertha Lester, was a widow with three minor children. She owned and operated a business known as the Rio Rita Bar, which she had inherited from her husband, on leased property located on East Speedway and

---

1. He was also awarded the Cadillac automobile in his possession.

Tucson Boulevard in Tucson, Arizona. At that time appellant, a disbarred lawyer, was married to Imogene Myrland. The parties became acquainted during 1941 and in 1942, Mr. Myrland began to work as a bartender at Mrs. Lester's bar. He also supervised a program of remodeling the premises in order to improve the business. This included moving toilets to the interior of the building, placing a window in front of the building, changing the lighting, and making some other improvements, which were all paid for by Mrs. Lester. Both parties devoted their entire working time to the operation of the bar business on a daily basis from 1942 through July 31, 1947, when the lease expired. At that time the landlord wanted a substantial increase in rent and Mrs. Lester permanently closed the business.

Mr. Myrland's testimony concerning the foregoing period was that on or about May, 1942, the parties entered into an agreement to jointly operate the Rio Rita Bar for profit. Mrs. Myrland's testimony was that at all times Mr. Myrland was an employee and was paid in cash on an hourly basis. No written agreement was produced.

In 1947, at Mrs. Lester's request, Mr. Myrland established his residence in Mrs. Lester's home and did not pay for meals or rent. During the same year, Mrs. Lester purchased a vacant lot in her own name at Speedway and Dodge Boulevard in Tucson. A building was constructed on the lot for the operation of a new bar business, also to be known as the Rio Rita Bar. The lot cost $8,750 and the construction and bar furnishings cost approximately $23,000. Of this sum, $24,750 was derived from the earnings of the old Rio Rita Bar and $7,000 was in the form of a loan from the Valley National Bank, which was secured by a mortgage on Mrs. Lester's home, her separate property.

The appellant assisted Mrs. Lester at every step in the establishment of the new Rio Rita Bar. He worked with the real estate broker, the architect, and the workmen involved in the construction of the new building. Prior to opening, both parties went to Los Angeles to purchase furniture and fixtures for the bar from a hotel supply company which paid their travel expenses.

The new Rio Rita Bar at Speedway and Dodge Boulevard was opened for business on December 24, 1947, and both parties operated it. The Number 6 liquor license remained in Mrs. Lester's name.

On July 31, 1948, Mrs. Lester sold the Rio Rita Bar and the premises were leased for a rental of $400 a month. From that time until June, 1949, the parties had no business, were not engaged in any money-making operations, continued to live together at appellee's home and sustained themselves from the proceeds of the sale of the Rio Rita and the rental income from the bar property.

In June, 1949, the parties began negotiations to purchase property located at Jaynes Station, Tucson, known as Johnny's Outpost, which consisted of two and one-half acres of land, a pump, a well, a building in which a bar business known as Johnny's Outpost was being conducted, a one-bedroom house, a cafe, a service station and an unfinished cement block building.

The property was purchased in Mrs. Lester's name for approximately $50,000. The sale was consummated on July 1, 1949, and Mr. Myrland established a temporary residence at Jaynes Station. Both parties commenced operation of the bar business in the same manner as they had operated the Rio Rita Bar and devoted substantially all their time to its operation.

In 1951, the State of Arizona initiated the first of two condemnation actions on a portion of the Jaynes Station property for construction of the Interstate Highway from Tucson to Phoenix. Settlement negotiations failed and the matter went to trial. Mrs. Lester was represented by her son, Ralph Lester, an attorney, and since she was out of state at the time, Mr. Myrland testified as to damages. Appellee received an award of $15,000 plus interest of

approximately $2,000. The $17,000 was applied to the mortgage on the property and the liquidation of a note.

The new highway was located at the rear of Johnny's Outpost and Mr. Myrland remodeled the building so as to place the front entrance where the rear of the building had been.

In June, 1952, Mr. Myrland obtained a divorce from his wife and on July 29, 1952, he and appellee were married in New Mexico. After the marriage there was no substantial change in the manner in which the Outpost business was conducted or in the manner in which the parties lived in appellee's home.

The Outpost Bar was operated by them until it was sold in August, 1953. Appellee also leased part of the property and in one lease to the Standard Oil Company appellant executed a disclaimer to that portion of the property. In 1966, the State initiated a second condemnation action. Appellee received approximately $42,000 as damages and interest of $9,000. In addition, she was receiving the following rental income: $300 a month from the Outpost Bar; $112.50 a month from American Oil Company; $150 a month minimum from Standard Oil; and $500 per month from the Rio Rita Bar.

From 1953 when the Outpost Bar was sold, until August 19, 1969, the date appellee filed her complaint for divorce, the parties maintained themselves from the rents derived from the properties in appellee's name. Their home and two adjacent lots remained in the name Bertha Lester, as did the Rio Rita Bar property and Jaynes Station, and all of these properties were acquired by appellee prior to her marriage to appellant in July, 1952.

Appellee maintained several bank accounts over which she exercised almost total and complete dominion. In 1949, she opened a trust account at Tucson Federal Savings for her daughter in the amount of $11,183.27. In December, 1953, she opened trust accounts for her sons, one for $9,844.62 and the other for $9,875.32. In November, 1966, Mrs. Myrland opened a joint savings account with $10,000 from the second condemnation award and transferred the funds into her name only on August 18, 1969, the day after an altercation between the parties and one day prior to filing her complaint for divorce. Mrs. Myrland also maintained two accounts in Southern Arizona Bank, both solely in her name. She also banked at the Valley National Bank, and only one certificate of deposit, in the amount of $3,000 was a joint account. The account became inactive, matured and was transferred to a certificate in the name of Mrs. Myrland. It was kept in her safe deposit box, to which Mr. Myrland had no access. Of an approximate $82,299.94 in various banks, only a total of $15,149.51 had ever been in joint accounts with appellant. Mr. Myrland testified that the only time he was permitted to sign checks was during a short period while Mrs. Myrland was in the hospital. He also testified that Mrs. Myrland handled all income, the condemnation awards, and he did not know exactly what she did with the money or how she had invested it. He never asked her for an accounting.

This case presents two primary issues on appeal: (1) Whether or not during the years prior to their marriage, the parties entered into an agreement whereby Mr. Myrland was to be a partner with appellee so that he acquired an interest in her property; (2) whether or not the property acquired in appellee's name prior to her marriage to Mr. Myrland and the cash accretions thereto in the seventeen years after the marriage is the sole and separate property of appellee or the community property of the parties.

## THE PARTNERSHIP ISSUE

In his counterclaim Mr. Myrland asserted that prior to their marriage the parties entered into an agreement, the substance of which was that everything appellee owned was to belong to both of them.

Mrs. Myrland repeatedly denied the existence of any such agreement during direct

examination and cross-examination. Her position was that not only had no oral agreement been entered into, but that the conduct of the parties, especially her complete control over all income, demonstrated that Mr. Myrland was, during their years of working together, an employee.

The trial court made three pertinent findings of fact on the partnership issue, which this court is compelled to uphold upon an examination of the record:

"4. Defendant asserts an interest in the property of plaintiff pursuant to an agreement of partnership which is alleged to have been entered into some time in the year 1942.

5. Defendant has failed to sustain the burden of proof as to the alleged partnership agreement.

6. No agreement of partnership was entered into between the parties."

Mr. Myrland testified that one of the reasons for a lack of documentation as to a partnership agreement was that at the time he became associated with appellee he was a married man, and he wanted to be in a position, if interrogated under oath as to his property holdings, to deny ownership of property, thereby making his interest unavailable to his first wife.

In a further attempt to establish the existence of a partnership and to refute Mrs. Myrland's position that he had been an employee, Mr. Myrland showed the court that in all the years he worked with appellee, she did not withhold any social security or federal withholding taxes, and at no time listed him as an employee under Workmen's Compensation, as she did for other "employees". However, Mr. Myrland compounded the above in that for the years prior to marrying appellee, from 1942 through 1952, he never filed any income tax returns for himself or for the alleged partnership. As a former lawyer, Mr. Myrland was familiar with the obligation to report all income. Mrs. Myrland's testimony is that she did not withhold taxes or list Otto as an employee because "he didn't want to."

Mr. Myrland also pointed out that he had authority to go into the cash register at the Outpost and take advances on money due him, merely leaving "tickets" saying how much he took. He was able to do this, according to appellee, "whenever he felt like it."

While the above facts and other too numerous to describe in detail, do not necessarily present the usual employer-employee relationship, one cannot make a leap from a special or unusual financial and social relationship and convert it into a legal partnership, where certain critical indicia are absent.

■ Although courts have encountered difficulty in setting forth exact tests by which to determine the existence or nonexistence of a partnership relation, in the last analysis the facts, circumstances, and most important, the intention of the parties control. Tripp v. Chubb, 69 Ariz. 31, 208 P.2d 312 (1949).

■ Lack of partnership documentation is not the critical factor as a partnership may be formed by an oral agreement. Johnson v. Hill, 1 Ariz.App. 290, 402 P.2d 225 (1965).

A.R.S. § 29–206 defines a partnership:

"A partnership is an association of two or more persons to carry on as co-owners a business for profit."

However, A.R.S. § 29–207 sets forth rules for determining the existence of partnership, including:

"4. The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:

\*    \*    \*    \*    \*    \*

(b) As wages of an employee . . . ."

■■ There was sufficient evidence presented by Mrs. Myrland to refute the claim that the parties were "co-owners." A participation in profits does not necessarily constitute the recipient a legally re-

sponsible partner, in the absence of such fundamental requisites as intention, co-ownership of the business, community of interest, and community of power in administration. 59 Am.Jur.2d Partnership §§ 43, 48 (1971).

The parties in the instant case had an unusual social and business relationship, but Mr. Myrland did not prove that it rose to the level of a true, legal partnership. At most, he was special employee because of his personal relationship with appellee and her reliance on his expertise in legal and business matters. Mrs. Myrland's control over her property and income, her denial of a partnership agreement, and the secondary role Mr. Myrland played in relation to the control and authority over the property affirm the trial court's conclusion that no partnership agreement was entered into between the parties, and hence Mr. Myrland acquired no interest in appellee's property.

## THE COMMUNITY PROPERTY ISSUE

Mr. Myrland proposes that he has an interest in the Rio Rita property acquired in 1947, the Outpost property acquired in 1949, and income derived from both businesses under a partnership theory prior to marriage, or under a community property theory after his marriage to Mrs. Myrland in 1952, by virtue of their joint and common efforts in the operation and enhancement of the properties. He alleges that the value of the common property increased because of his business judgment, management and work in the two business operations. He also alleges that there was extensive commingling of the joint or common property with community property, evidencing an intent that it was all community.

■ Mr. Myrland finally claims a one-half interest in all monies from the businesses which had, at one time or another, been deposited by Mrs. Myrland in joint accounts, citing the doctrine of O'Hair v.

O'Hair, 16 Ariz.App. 565, 494 P.2d 765 (1972). The O'Hair decision was released by our Supreme Court a week before oral argument in the instant appeal. It held that the form of a bank account is not sufficient to establish the intent of the depositor to give another a joint interest in or ownership of the deposit, and it is the intention of the depositor which is controlling. O'Hair v. O'Hair, 109 Ariz. 236, 508 P.2d 66 (1973). We find the evidence to be that appellee did not intend to change the character of a portion of her sole and separate funds by temporarily placing them in joint accounts with appellant, and the joint custody of the accounts negatives any idea of a gift. Appellant, therefore, obtained no ownership of funds placed in joint accounts by appellee, over which she maintained control, and which she placed in her sole name prior to the litigation below. As the creator of the bank accounts and the holder of the bank books, Mrs. Myrland was free to withdraw these funds, which had their source in her separate property, and to do with them as she chose. There was no showing that the joint accounts were commingled with community property and no showing that they were intended to be a gift to appellant.

■ The partnership issue has already been resolved in Mrs. Myrland's favor, and we believe that the well-settled principles of community property law will resolve the above issues in Mrs. Myrland's favor as well.

■ The basic principle here applicable is that the status or character of property is determined at the time of acquisition. In Arizona, property owned or acquired prior to marriage is separate property and does not become community property after marriage. A.R.S. § 25–213. It is possible for the separate character of such property to be altered after marriage by agreement, gift or commingling; however in the absence of such circumstances, it remains separate property after marriage. Lovin v. Woodward, 45 Ariz. 105,

40 P.2d 102 (1935). Once the character of property as separate has been determined, it does not change except by agreement or operation of law, Porter v. Porter, 67 Ariz. 273, 195 P.2d 132 (1948), and it remains separate during marriage even though it may be sold and other property purchased with the proceeds. Nace v. Nace, 104 Ariz. 20, 448 P.2d 76 (1968).

In the instant case the trial court found as a fact and concluded that Mrs. Myrland acquired and owned as her sole and separate property the Rio Rita and Outpost properties. Both were purchased by her prior to her marriage to appellant in 1952 although appellant did work in the businesses since 1942. From 1942 until 1953 when the Outpost was sold, Mr. Myrland received a salary or income from appellee for his time and labor, and none of this income was ever commingled with income from the separate property or deposited in any joint account with Mrs. Myrland. Appellant's salary and the rents, increases and profits from appellee's properties were never commingled so that a transmutation occurred and it is clear that appellee's property did not lose its separate identity so as to cast it into community property. Bourne v. Lord, 19 Ariz.App. 228, 506 P.2d 268 (1973); Guthrie v. Guthrie, 73 Ariz. 423, 242 P.2d 549 (1952).

■ That the value of appellee's properties increased during the years that Mr. Myrland worked thereon also does not serve to change their character from separate to community. Mrs. Myrland devoted as much working time and labor to the operation of her businesses as did Mr. Myrland. Appellant received an income for his services and also received such benefits as housing, food, use of automobiles and vacations. That Mrs. Myrland supplied these benefits from separate property income does not operate to change the status of the income's source.

■ The trial court made a finding of fact that the "community property of the parties consists only of personal property in the form of cash or bank deposits and is in the amount of $4,874.85", based on community income earned during the period from about July 29, 1952 to August 1, 1953 from the operation of the Outpost. As a conclusion of law the trial court awarded Mr. Myrland the sum of $2,437.43 less $1,500 in funds he had taken from appellee. It did not, however, make a specific finding that the savings accounts and stock in Mrs. Myrland's name were her sole and separate property. Nevertheless, the purpose of Rule 52(a), to aid the appellate court by affording it an understanding of the ground or basis of the trial court's decision, was met. Wright and Miller, 9 Federal Practice and Procedure § 2571 (1971).

■ For the purpose of appellate review there is implied in every judgment findings of fact in addition to express findings made by the court, necessary to sustain the judgment, where such additional findings are reasonably supported by the evidence and are not in conflict with the express findings. King Realty, Inc. v. Grantwood Cemeteries, Inc., 4 Ariz.App. 76, 471 P.2d 710 (1966); In re Holman's Adoption, 80 Ariz. 201, 295 P.2d 372 (1956). The record demonstrates sufficient evidence to support a finding that the bank accounts were appellee's separate property.

Judgment affirmed.

HATHAWAY, C. J., and KRUCKER, J., concur.